# Paxson's Estate.

*Wills—Gift to charity—Attesting witness—Subscribing witness—Probate —Act of April 26, 1855, P. L. 328.*

An attesting witness must be a subscribing witness within the meaning of the Act of April 26, 1855, P. L. 328, which enacts that "No estate, real or personal, shall hereafter be bequeathed, devised, or conveyed to any body politic, or to any person in trust for religious or charitable uses, except the same be done by deed or will, attested by two credible, and, at the time, disinterested witnesses, at least one calendar month before the decease of the testator or alienor."

The attesting witnesses to a will devising to a charity must be disinterested at the time of their attestation.

Argued Jan. 15, 1908.    Appeal, No. 224, Jan. T., 1907, by Commonwealth ex rel.  The National Farm School and L. Webster Fox, M. D., William S. Erdman, M. D., and T. Howard Atkinson, trustees of the "Buckingham Agricultural Institute" or Home for Boys, from decree of O. C., Phila. Co., April T., 1906, No. 11, dismissing exceptions to adjudication in Estate of Edward M. Paxson, deceased.  Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Exceptions to adjudication.

PENROSE, J., filed the adjudication which was in part as follows:

The decedent, Hon. Edward M. Paxson, died without issue, October 12, 1905.  By his will, admitted to probate November 8, 1905, upon proof by two witnesses of handwriting of signature, he gave $100,000 and certain real estate to his wife, Mary M. B. Paxson, absolutely, and certain other personal property there set forth—the residue of his estate, after various gifts more fully set forth in the petition for distribution hereto annexed, being given to her for life.

The will contains charitable gifts as follows: " All my remaining farms in Bucks county, including the Walker farm adjoining 'Nonesuch' and subject as to Bycot Farm to my wife's life estate, I give to my said wife and to my friends,

L. Webster Fox, M. D., William S. Erdman, M. D., Harmon Yerkes and T. Howard Atkinson and their heirs, in trust, nevertheless, to establish and found at 'Nonesuch' the farm I recently purchased, . . . . a Home for poor boys, where they shall be properly educated as farmers, gardeners, etc. I leave the Trustees to fix the age at which they may be received and merely suggest from six to sixteen, and to remain until they arrive at twenty-one years, and that after a trial term, they be regularly indentured as apprentices, and in all cases the control of parents over them to be absolutely released. They should be well instructed in the dairy and all branches of farming, as well as in truck gardening; and when their term has expired, I want each boy who has a satisfactory record, to have a good outfit of clothing and one hundred dollars in gold, to commence the world with; also a certificate that he has graduated with credit. I am induced to found this institution from the fact that so·many of our young men are abandoning the farming business, which I consider a great mistake. I leave the Trustees to name the institution, and merely suggest that of 'Buckingham Agricultural Institute.' I presume the Trustees will procure a charter; the vacancies in the Board to be filled from time to time by the appropriate court of Bucks county. I do not desire to encumber this will with minute directions, nor do I wish to tie the hands of the Trustees. I may leave some thought as to the management for the consideration of the Trustees, which, however, will be no part of my will, and not binding upon the Trustees. And that the institution may not lack support, I give the said Trustees the sum of one hundred thousand dollars, which sum shall be largely increased on the death of my wife; in trust for the purposes above mentioned.

" . . . . And from and after her death, I give and devise all my real estate in the borough of Newton, Bucks county, to the 'Friends' Boarding Home' of Bucks Quarterly Meeting, its successors and assigns, to be used and enjoyed, however, only so long as the said 'Home' shall be kept for such purposes as at the present. In case it shall not be kept as such home for the period of one year, then the subject of this devise as well as the Home itself, shall revert to my residuary estate.

" And from and after the death of my said wife, I give, be-

queath and devise all my estate remaining at that time to the Trustees of the Home for boys, hereinbefore named, or their successors, in trust for carrying on the aforesaid provisions for said Home. . . . I suppose my executors will be obliged to pay the collateral inheritance tax on the gift to the Home for poor boys, but I think they should not tax such a charity, and I therefore request my executors and trustees of the Home to apply to the legislature for an appropriation for an equal amount."

The will was signed by the testator January 23, 1905, nearly nine months before his death. It was written by Horace Yardley, secretary of the Jayne estate, from a draft which appears to have been made by the testator himself. It is free from the slightest ambiguity, and the charity which it seeks to create and provide for is of the most deserving and beneficent character, but while all its other provisions are effective, the charitable gifts must fail for the reason the testator has failed to comply with the requirements of the act of April 26, 1855, regulating testamentary dispositions of real and personal estate for such purposes.

That act declares, in language which is explicit and peremptory, that " No estate shall be bequeathed, devised or conveyed to any body politic, or to any person, in trust for religious or charitable uses, except the same be done by deed or will, attested by two credible, and, at the time, disinterested witnesses, at least one calendar month before the decease of the testator or alienor ; and all dispositions of property contrary hereto shall be void and go to the residuary legatee or devisee, next of kin or heirs, according to law."

The will itself shows that it was the intention of the testator that it should be attested by at least two witnesses. It has, at the end, the usual attestation clause, " Sealed and signed in the presence of us," but the intended witnesses are wanting.

The testimony shows that the will, having been engrossed by Mr. Yardley, was brought by him to the Jayne building, on the north side of Chestnut street, in the morning of January 23, 1905, and taken to the rooms of the Jayne estate, of which Judge Paxson was one of the trustees, in the second story. Patrick Keefe, the janitor and messenger of the estate, was there at the time or came in soon afterwards, and was

told by Mr. Yardley that the paper which he then had was a will which Judge PAXSON intended to execute. It does not appear, however, that Patrick examined the paper or that he had any knowledge of its character or its contents than what he was thus told by Mr. Yardley. Judge PAXSON came in at a later hour. He seated himself at the table in the main room of the Jayne office, and while Mr. Yardley, who stood by his side, read the original draft, he had before him the engrossed copy, and saw that it was correct. He then signed the latter, not only at the end, but at the foot of each page, Mr. Yardley turning over the pages for him as he did so.

Patrick Keefe, while this was going on, was in the adjoining room, at a distance of perhaps fifty feet, reading a newspaper. The rooms were communicating, with a wide, high opening between, so that from where he sat, the table, the testator and Mr. Yardley were in full view. He might, therefore, have seen the act of signing, but he was unable to say that he did; and even if he had, he could not, except from what he had been told by Mr. Yardley, in the absence of the testator, have known that what was signed was a will. See upon this subject, Hock v. Hock, 6 S. & R. 47. It is true that Patrick testified that he saw a paper on the table in Mr. Yardley's room at the time, which, when the will was brought before the auditing judge from the office of the register of wills, he identified as the same paper, though he only saw the outside of it, declaring that its appearance when on that table was precisely that of the paper from the register. The absolute unreliability of such evidence is shown by the fact that the latter paper had on it the buff colored back put on in the register's office, which it certainly had not when it was signed by the testator.

After the will was signed, Mr. Yardley asked the testator who were to be the witnesses, to which the reply was that he (Yardley) and Patrick would do; but when his attention was called to the fact that the will gave a small legacy to each, and that they might, perhaps, on that account, be disqualified, he agreed that this might be so, and said that "Mr. Oellers and Mr. Harrington are coming to see me on business, and when they come I will ask them to witness it." This, however, was never done.

Some months afterwards, in conversation with various friends, who were examined before the auditing judge as witnesses, he spoke of having executed a will and of the charities which it provided for, referring especially to the home for poor boys and the plan for educating young farmers, in which he expressed great interest; but the will by which this was done was not exhibited to the witnesses, nor was there anything by which they could identify it.

The ordinary method by which a will is attested is by having it witnessed by persons who, at the request of the testator, sign their names for that purpose; but subscription is not, perhaps, the only method of attestation, though, obviously, mere proof of the genuineness of the signature of a testator is not "attestation." The act of 1833 requires that a will shall be "proved" by two witnesses; and any written instrument, in the absence of statutory requirements, is proved, if there are no subscribing witnesses, by proof of the signature. When, therefore, the act of 1855 declared that in order to create a valid charity the will must be "attested," something different from the "proof" which was sufficient in the case of an ordinary will was manifestly intended. The act was a remedial one and its purpose was apparent. It was to protect testators against their own weakness and from the importunities and undue influence of designing persons, often exercised at the expense of those to whom the testator was under moral obligation to make provision for. The law, to use the language of Judge Mitchell, in Hoffner's Estate, 161 Pa. 331, 343, "recognizes such bequests as valid, but requires them to be made when the judgment is clear, and the obligation is not sharpened or exaggerated by the terrors of impending death." It is to be so construed as to prevent the mischief which it was designed to correct, and this would be done very ineffectually, if at all, if "attestation" is to be regarded simply as the equivalent or synonym of "proof." Nothing would be easier than to antedate the will and dispense with witnesses, and then, the presumption being that the date was the actual one, the statutory provision that it must be at least one calendar month before the death of the testator would, in many, if not the majority, of cases, be a nullity. To attest a will the witnesses must be able to identify the instrument as the act of the tes-

tator, not simply from the appearance and nature of the paper itself, but from the declaration of the testator and its identification by him at the time. Whether he must not also request the persons to bear witness that the instrument is his will need not be considered.

Undoubtedly many instances have occurred and will occur, of which the present is a striking example, where most deserving charities have been defeated by the failure of testators to comply with the requirements of the act; but the responsibility is upon the testator who does this and not upon the court whose duty it is to decide an abstract question. The act is plain and its terms peremptory, and judges cannot disregard it or allow themselves to be influenced by the hardship of any particular case. Cases of hardship frequently occur as the result of statutory enactments, as, for example, the act requiring a promise to pay the debt of another to be in writing (see Schafer v. Bank, 59 Pa. 144), or the act requiring a will to be signed "at the end thereof," which, as held in Wineland's Appeal, 118 Pa. 37, in an opinion by Judge Paxson himself, must be literally complied with, even if the words following the signature do not affect or change the dispositions made by the instrument. In the present case the testator was perfectly familiar with the law. He knew that the will so far as concerned the charitable gifts was incomplete until duly attested; and he declared that he would, at a later time, see that this was done; but, whether from forgetfulness, inattention, or because of some contemplated change, it never was done.

The act has been on the statute book for more than fifty years and very many cases have occurred, frequently in our own court, in which gifts of this character have been declared inoperative because the will was not attested by two witnesses, though it had been admitted to probate upon proof of the handwriting of the testator. The correctness of this, so far as appears, has never hitherto been questioned. So long ago as 1862 a very distinguished judge (Thompson, P. J., of the court of common pleas of Philadelphia) thus decided in Hupfeld's Estate, 5 Phila. 219, and a no less distinguished judge, of the orphans' court of Allegheny county, decided (in 1891) in the same way in Gray's Estate, 147 Pa. 67, 69, the decree

being affirmed by the Supreme Court. The contemporaneous and continued construction of a statute, where its meaning is in doubt, will not be departed from. Contemporanea expositio est optima et fortissima in lege; and Optimus legis interpres consuetudo. But the meaning of the act of 1855 is not, in the opinion of the auditing judge; doubtful. No other argument is required than the act itself, its words are free from ambiguity and interpretation is unnecessary. Quoties in verbis nulla ambiguitas est ibi nulla expositio contra verba fienda est.

The auditing judge is compelled, therefore, notwithstanding the exceptionally able argument of counsel representing the charity and the commonwealth, to decide, though with great regret, that the charitable gifts have failed by reason of the omission of the testator to execute the will in accordance with the requirements of the act of 1855, regulating such dispositions ; and as the ultimate gift was residuary, the result is to this extent, an intestacy, one-half of the personal estate passing to the widow of the testator and the other half to his next of kin, his nephews and niece and grandnephews and nieces whose names are set forth in the petition hereto annexed, per stirpes.

Exceptions to the adjudication were dismissed by the court in the following opinion :

ASHMAN, P. J. : We adopt the adjudication of Judge PEN-ROSE as the opinion of the court. It was attempted to prove the gifts to charity by two witnesses, one of whom, seated at a distance of fifty feet or more from the testator, could identify the paper upon which the testator wrote as the will, only because the draughtsman, the other witness, had told him that it was the testator's will, evidence which was purely hearsay. His testimony was defective in this, that it required to be supplemented by that of another; whereas, under repeated decisions, each witness to a charitable gift must, from his evidence, based on independent knowledge and information as an eyewitness, meet all the requirements of the statute : Hock v. Hock, 6 S. & R. 47 ; Mitchell v. Low, 213 Pa. 526. To make good his deficiencies by cumulative testimony furnished by another eyewitness, or by after-declarations of the testator to others that he had executed a will bequeathing to charities

which he described in terms corresponding with those named in his will, is not permissible; a chain is no stronger than its weakest link, and this is true in law as in physics: Derr v. Greenawalt, 76 Pa. 239.

Neither witness had signed; and if either had died before the hearing, the gifts must have fallen. The act of 1855, in our opinion, carefully guards against such a mischance. It provides that no estate shall be conveyed or willed to a charity, "except the same be done by deed or will, attested by two credible and at the time disinterested witnesses, at least one calendar month before the decease of the testator or alienor." The orderly arrangement of these provisions seems to indicate that the attestation should be made at least one calendar month before the death : Gray's Estate, 147 Pa. 67. If the witness attest the will by signing, and we know no case where an instrument has been held to be attested except by the signatures of the witnesses, and one or both should die, proof of their signature will carry with it the legal presumption that the will was executed in conformity with all legal requirements. It is incredible that the legislature could have meant to subject a will giving, as in this instance, a million to charities, to the hazard of the continuance in life of a single witness. The testator, who had but recently resigned from the highest judicial office of the commonwealth, evidently entertained this view. He acquiesced in the suggestion by the draughtsman, whom he requested to sign, that he and Keefe, being legatees, were perhaps interested witnesses within the meaning of the act, and were therefore ineligible; and he declared that he would have two other witnesses sign the instrument. He, therefore, manifestly regarded the will as at that time incomplete. It is useless to speculate upon this after-inaction ; he may have intended, on further reflection, to add other provisions to the instrument. But he did nothing, and his will remains as he saw fit to leave it.

For the reasons given by the auditing judge, we concur in his decision that the collateral inheritance tax imposed by the Mexican government on inheritances and legacies was due and payable by the estate of the testator out of the proceeds of the mortgage held by him upon the property of the Amparo Mining Company, the mortgagor.

106　　　　　　　PAXSON'S ESTATE.

Opinion of Court below—Concurring Opinion of Court below. [221 Pa.

The claim of John R. Williams to certain shares of stock of the Amparo Mining Company, to the rejection of which exceptions were filed, is referred back to the auditing judge, with his own consent, for further consideration.

The remaining exceptions are dismissed.

PENROSE, J., concurring: It must always be a source of great regret that a charity which might have been productive of so much benefit to the community should fail, or that a fortune so large should go to those whom the testator, apparently, did not wish to have it; but the act of assembly which—wisely, as has heretofore been supposed—regulates the methods by which such benevolences (often the result of importunities at a time when the donor is not in a state of mind to resist them, and when perhaps his own fear or selfish desire for post-mortem admiration causes him to overlook those for whom he ought to provide) are to be created, declares that "No estate . . . . shall . . . . be bequeathed, devised or conveyed to any body politic or to any person in trust for religious, charitable, literary or scientific uses except the same be done by deed or will, attested by two credible and at the time disinterested witnesses, at least one calendar month before the decease of the testator . . . . and all dispositions of property contrary hereto shall go to the residuary legatee or devisee, next of kin or heirs, according to law."

The question, therefore, unaffected by the merits of the gift or the amount given, is a very simple one: What is the method by which, alone, under the mandates of the act, a valid charitable disposition of an estate can be made by will? and in the consideration of this question it is manifest that the eminence of the testator or the profundity of his legal attainments can have no weight whatever, for, to use the language of Professor Gray (Rule against Perpetuities, preface page, v), "If the answer to a problem does not square with the multiplication table one may call it wrong, although it be the work of Sir Isaac Newton." The act is a remedial one aimed at an obvious mischief; it has been on the statute books for more than fifty years, during all of which time its meaning has been supposed, by bench and bar, to be clear and free from doubt; it has been acted upon, under this general understanding, in

innumerable instances; and so far as its plain expression called for interpretations, the rule that remedial statutes are to be so construed as to suppress the mischief and advance the remedy— "suppressing all subtile inventions to creep out of the statute" —has never been lost sight of.

The act, as already stated, declares that no such testamentary disposition shall be made except by "deed or will attested by two credible and at the time disinterested witnesses, at least one calendar month before the decease of the testator." It must not only be by a will executed at least one calendar month before such death, but that will must be not simply "proved," as in the case of an ordinary will, but "attested" by two witnesses. Obviously some kind of proof differing from the ordinary proof is there made requisite. When a statute uses a different term from that used in another statute relating to the same general subject, the rule is elementary that a different meaning is intended; and the difference in the meaning of the words "proved," as used in the act relating to ordinary wills, and "attested," as used in the act with regard to wills creating charities, has been shown by eminent jurists, in language substantially the same in very many cases—beginning with what was said by Judge Oswald Thompson, in 1861, in Hupfeld's Estate, 5 Phila. 219; Irvine's Estate, 206 Pa. 1—being the last utterances of the Supreme Court on the subject. See also Gray's Estate, 147 Pa. 67, etc. There must be two witnesses, and each must "attest"— whatever that may be—the "will" which contains the charitable gift. An "attesting" witness in the sense used by the statute, can be no other than one who of his own knowledge can identify the instrument as that executed by the testator "not less than one calendar month before" his death. The witnesses who "attest" must be credible and "at the time" disinterested. At what time? At the time of attestation. And what is it that they attest? That the will, which they must each be able to identify (see Simrell's Estate, 154 Pa. 604), was executed at least one calendar month before the death of the testator; and here there is but one person who can testify as to the execution of the will, the other who was called for the purpose not only having no knowledge of his own that the instrument was the testator's will, but being

unable to say that he saw it "signed at the end thereof" or at all.

That declarations of the testator, not having the will in the presence of the person to whom they are made, that he has disposed of his estate in a designated way, are not the equivalent of a witness required to prove a will, was expressly decided in Derr v. Greenawalt, 76 Pa. 239, in an opinion by Judge SHARSWOOD, citing Clark v. Morton, 5 Rawle, 235, where the same thing was decided in the case of Judge Morton's will. Very eminent counsel (Mr. Meredith and Mr. Williams) contended for a different ruling in Clark v. Morton, but the law was too obviously against them, and the question cannot now be regarded as an open one. It is not affected by Scott's Estate, 147 Pa. 89, an exceptional case, which was explained in the very recent case of Willing's Estate, 212 Pa. 136, where the court below was reversed for following what was erroneously supposed to be the doctrine newly established by Scott's Estate.

In the present case Judge PAXSON had intended to comply with the act. The will which he signed was copied from a draft which he himself had made. It contained the usual attestation clause, to be subscribed by two witnesses; but it having been suggested to him that the two persons whom he had intended to call might not be "disinterested" within the meaning of the act, he concurred in the suggestion, declaring that he would have two others, whom he named, whom he expected to see later in the day; but whether from forgetfulness on his part, or inattention, or from an unexpressed idea of subsequent changes in the will, he failed to do so.

The consequence is most unfortunate, but it is not in the power of the court to avoid this. The mandate of the act is positive, and, as said in Gorgas v. Saxman, 216 Pa. 237, a "ruling made to cover the exigencies of a particular case makes bad law generally."

*Error assigned* was in dismissing exceptions to adjudication.

*Abraham Israel* and *Russell Duane*, with them *Alfred N. Keim* and *John E. Fox*, for appellants.—The evidence pro-

duced in behalf of the charity satisfies the requirement of the act of 1855 that the will shall be "attested by two . . . . witnesses:" Irvine's Est., 206 Pa. 1; Lewis v. Maris, 1 Dallas, 278; Crisp v. Walpole, 2 Hagg. Eccl. 531.

The terms in the act of 1855 are technical terms, and, therefore, they must be taken according to the acceptation of the learned in the profession; they must not be given any restricted or popular meaning; neither should they be interpreted in any colloquial or derivative sense, such as we have shown has sometimes been given to the term "attested" in other jurisdictions: Price v. Maxwell, 28 Pa. 23; Jones v. Murphy, 8 W. & S. 275; Grabill v. Barr, 5 Pa. 441; Hays v. Harden, 6 Pa. 409.

There may be perfect "attestation" without "subscription:" Swift v. Wiley, 1 B. Mon. (Ky.) 114; Reed v. Watson, 27 Ind. 443; In re Downie's Will, 42 Wis. 66.

Of the witnesses produced at the audit in behalf of this charitable bequest, Messrs. Yardley, O'Keefe, Fox, Erdman and Anders each established by his testimony the fact that the testator executed the will, which had been probated, more than one calendar month before his decease, and it is submitted that any two of them were competent attesting witnesses to establish this charitable bequest within the meaning of the act of April 26, 1855: Carson's App., 59 Pa. 493; Rice's Est., 173 Pa. 298; Eyster v. Young, 3 Yeates, 511; Mullen v. McKelvy, 5 Watts, 399; Rutherford v. Maule, 4 Hagg. Eccl. 213.

It is entirely immaterial that the testator did not himself select or request any of the appellants' witnesses to witness his will: Rohrer v. Stehman, 1 Watts, 442; Brett v. Brett, 3 Addam's Eccl. 210.

That the attestation clause was unsigned in no way affects the validity of this will or of the charitable bequest: Mellert's Appeal, 13 W. N. C. 222; Buckle v. Buckle, 3 Phillimore Eccl. 323; Watts v. Public Administrator, 4 Wendell (N. Y.), 168; Goods of Jerram, 1 Hagg. Eccl. 550; Goods of Vanhagen, 1 Hagg. Eccl. 478; Goods of Sparrow, 1 Hagg. Eccl. 479.

*John G. Johnson*, for John Stopp et al., appellees.—Two witnesses must each testify to all the facts necessary in proof

of execution, and the testimony of the second witness is insufficient if it requires to be supplemented by that of the first witness, and does not cover every essential : Hock v. Hock, 6 S. & R. 47; Irvine's Est., 206 Pa. 1; Simrell's Est., 154 Pa. 604; Michell v. Low, 213 Pa. 526.

The requirements of attestation imposed by the act of 1855 were not complied with : Irvine's Est., 206 Pa. 1; Luper v. Werts, 23 Pac. Repr. 850 ; Gerner v. Mosher, 78 N. W. Repr. 384; Donovan v. St. Anthony & D. Elevator Co., 80 N. W. Repr. 772 ; Seal v. Claridge, L. R. 7 Q. B. Div. 516 ; Skinner v. American Bible Society, 65 N. W. Repr. 1037 ; Jenkins v. Dawes, 115 Mass. 599 ; Swift v. Wiley, 40 Ky. 114; White v. Magarahan, 87 Ga. 217 ; Chase v. Kittredge, 93 Mass. 49 ; Reed v. Watson, 27 Ind. 443 ; Ludlow v. Ludlow, 35 N. J. Eq. 480 ; Robbins v. Robbins, 50 N. J. Eq. 742 (26 Atl. Repr. 673); Doe v. Burdett, 9 Ad. & El. 936 ; Sloan v. Sloan, 184 Ill. 579 (59 N. E. Repr. 952); Wright v. Wakeford, 4 Taunton, 213; Brown v. Skirrow, L. R. (1902) Prob. Div. 3.

*Samuel Dickson*, with him *Henry S. Drinker, Jr.,* and *Henry D. Paxson*, for Henry D. Paxson et al., appellees, cited : Irvine's Est., 206 Pa. 1; Hock v. Hock, 6 S. &. R. 47; Combs's App., 105 Pa. 155; Michell v. Low, 213 Pa. 526; Derr v. Greenawalt, 76 Pa. 239 ; Sloan v. Sloan, 184 Ill. 579 ; Phila. Ins. Co. v. Ins. Co., 23 Pa. 250; Jordan's Est., 161 Pa. 393 ; Search's App., 13 Pa. 108; Haus v. Palmer, 21 Pa. 296 ; Griffiths v. Griffiths, L. R. 2 Prob. & Div. 300.

OPINION BY MR. CHIEF JUSTICE MITCHELL, May 4, 1908 :

Appellants have presented a learned argument on the etymology and primary meaning of the word " attest," but unfortunately it has little bearing on the question in this case. The word has several variations of meaning, subordinate to the general sense, among which the latest authority, the new Oxford dictionary, gives (a) to bear witness to, to testify, to certify, (b) formally by signature. The exact question here is the sense in which the legislature used the word in the Act of April 26, 1855, P. L. 328.

By the general wills Act of April 8, 1833, P. L. 249, wills " in all cases shall be proved by the oaths or affirmations of

two or more competent witnesses." No subscribing witnesses are necessary, proof of the testator's signature by witnesses acquainted with his handwriting being sufficient, and the witnesses being only required to be "competent," i. e., disinterested, at the time of making proof. In the act of 1855, however, the legislature set an entirely different standard of proof. By that act "no estate, real or personal, shall hereafter be bequeathed, devised, or conveyed to anybody politic, or to any person in trust for religious or charitable uses, except the same be done by deed or will, attested by two credible, and, at the time, disinterested witnesses, at least one calendar month before the decease of the testator or alienor."

The purpose of this act is plain. It was to make reasonably sure that testamentary gifts to religion or charity were the result of deliberate intent of the testator, and were not coerced from him while in weakened physical condition under the influence of the doubts and terrors of impending death. The main feature of this precaution was, of course, the requirement that the gift must be by deed or will one calendar month before the decease of the donor or testator, and this fact must be attested by two credible and, at the time, disinterested witnesses. Nothing is easier than to antedate a writing, whether deed or will, and the statute guarded against that danger by the requirement that it should be not merely proved, but "attested" by two witnesses, and those two must be at "the time disinterested." At what time? Certainly not merely at the time of probate, for that was the general rule under the act of 1833, and did not need any re-enactment. Those whose memory goes further back than the evidence act of 1887 will recall the amount of time and argument spent over questions of the interest of witnesses, and whether the interest had been or could be released. The act closed all controversy on this point by the requirement that the witnesses should be disinterested "at the time." At what time? Clearly at the time the instrument was executed in the manner required by the statute. In Irvine's Estate, 206 Pa. 1, it was said by our Brother MESTREZAT, that this language "pre-supposes the existence of a writing signed by the testator at the time of the attestation," and that necessarily is the time the qualification of the witnesses must be referred to.

Having regard, therefore, to the change in the language of
the two statutes from "proved" in the act of 1833 to "at-
tested" in the act of 1855, to the requirement of the latter that
the two witnesses shall be "at the time" disinterested, and the
absence of any other reasonable intendment as to that time
than the date of compliance with the requirements of the stat-
ute, to wit: the execution of the will not less than a calendar
month before testator's death, and its attestation by two "at
the time" disinterested witnesses, the conclusion is not to be
avoided that the attestation must be by witnesses who then and
there make compliance with the statute certain by subscribing
their names.    An attesting witness under this statute means a
subscribing witness.

The learned court below called attention to the danger from
the death of one or both witnesses that the gift might fail if
the witnesses had not signed.    It is a strong argument, ab in-
convenienti, and adds to the force of the conclusion.  But we put
our decision on the manifestly intentional variation in the lan-
guage of the two statutes and the nature of the additional re-
quirements in the act of 1855.

Decree affirmed.